IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 18-cv-02335-RBJ

VICTORIA COURTNEY, on behalf of Clyde Courtney, deceased,

      Plaintiff,

v.

CLASS TRANSPORATION, INC., a Florida corporation
CER TRANSPORT, INC., a Florida corporation,
LANDSTAR SYSTEMS, INC, a Florida corporation,
LANDSTAR INWAY, INC., a Florida corporation,
LANDSTAR RANGER, INC., a Florida corporation,
LANDSTAR TRANSPORATATION LOGISTICS, INC., a Florida corporation,
STEEL KING INDUSTRIES, INC., a Wisconsin corporation, and
ISIDRO ARIAS-AGUILERA, an individual,

      Defendants.

---

ORDER ON PLAINTIFF'S MOTION FOR APPLICATION OF FLORIDA AND MISSOURI
SUBSTANTIVE LAW AND DEFENDANT LANDSTAR'S MOTION FOR SUMMARY
JUDGMENT

---

This matter is before the Court on plaintiff's motion for application of Florida and

Missouri substantive law and on the Landstar defendants' motion for summary judgment.  ECF

Nos. 113, 114.  For the following reasons plaintiff's motion is DENIED and defendants' motion

is GRANTED.[1]

---

[1] This order also grants intervenor plaintiff YRC Freight, Inc.'s motion to join in plaintiff's motion for
application of Missouri and Florida law.  ECF No. 116.

# I. FACTUAL BACKGROUND

The following facts are undisputed. Plaintiff filed this case as a result of an accident among three tractor trailers that occurred in the early morning hours on December 11, 2017 in Elbert County, Colorado. Clyde Courtney ("decedent") died as a result of this accident. ECF No. 79. Decedent's spouse, Victoria Courtney ("plaintiff"), filed this case against Class Transportation, Inc., Isidro Arias-Aguilera, CER Transport Inc., Landstar Systems, Inc., Landstar Inway, Inc., Landstar Ranger, Inc., Landstar Transportation Logistics, Inc., Steel King Industries, Inc., and Landstar Ligon, Inc. ("defendants"). *Id.* All defendants are engaged in the trucking industry. Ms. Courtney has brought multiple negligence, negligence per se, and respondeat superior claims against defendants for the death of her spouse. *See* ECF No. 79.

## A. **The December 11, 2017 Collision**

On December 11, 2017 three tractor trailers collided in Elbert County, Colorado on Interstate 70. ECF No. 113-8 at 2. Defendant Arias-Aguilera drove a truck and trailer registered to Class Transportation ("Class"). *Id.* at 4; ECF No. 123-8 at 4. Decedent Clyde Courtney drove a second tractor trailer registered to YRC Freight, Inc. ("intervenor plaintiff"). *Id.* Kenneth Morgan drove the third tractor trailer involved in the collision, although neither Mr. Morgan nor his carrier company, Averitt Express, are parties to this lawsuit. The Colorado State Patrol accident report labeled Arias-Aguilera's truck and trailer as Vehicle 1 and Courtney's as Vehicle 2. *Id.* at 4. The report reads

> Vehicle 1 was traveling very slow (approx. 30 MPH) and a tarp that was covering its load was unsecure and covering the back of the trailer including its tail lights. Vehicle 2 was behind Vehicle 1 and approaching it at highway speeds (63 MPH to 64 MPH). Vehicle 2 rear-ended Vehicle 1, pushing it forward. During the collision, Vehicle 2's fifth-wheel plate broke free from its location on the truck's chassis allowing Vehicle 2's trailer to come forward crushing the cab of the truck.

2

*Id*.  Mr. Courtney died as a result of injuries he sustained when the trailer crushed the truck's

passenger cab.  *Id*.

**B. <u>Relationships among co-defendants</u>**

Class Transportation is the carrier company that employed Mr. Arias-Aguilera and was

the registered carrier for the truck and trailer that he drove on the night of the collision.  ECF

Nos. 113-8 at 2; 56 at 5.  Class was formed as a Florida for-profit business on March 10, 2015,

and it listed Omar Nunez as its registered agent.  ECF No. 113-2 at 2.  CER Transport ("CER")

was formed as a Florida corporation on March 4, 2015, and it listed Osmel Nunez as its

registered agent.  ECF No. 113-1 at 2.  Both CER and Class operated as contract carriers and

were assigned different Department of Transportation ("DOT") registration numbers.  ECF Nos.

113-3, 113-4.

The Landstar enterprise is comprised of multiple entities.  I refer to them

collectively as Landstar.  Landstar has both broker authority and motor carrier authority.  ECF

No. 128-8.  Broker authority "allows [it] to arrange transportation between a Shipper and a

Motor Carrier."  *Id*.  Motor carrier authority permits it to "operate trucks and transport freight."

*Id*.  In the present case Landstar was primarily operating under its broker authority.  Landstar

admits that when is it acting in a motor carrier capacity—as opposed to a broker capacity—it

follows strict safety protocols in hiring and training drivers.  ECF No. 123-2 at 13.  Although

Landstar does not ask contract carriers to provide it with their internal safety, training, or hiring

policies, Landstar, when acting as a broker, takes numerous steps to confirm a carrier's safety

rating prior to contracting with it.  *Id*.

On September 28, 2017 Landstar and Osmel Nunez, on behalf of CER Transport, entered

into a transportation brokerage agreement where Landstar was the broker and CER was the

carrier.  ECF No. 113-6.  That agreement contained the following relevant provisions:

> 2. Carrier warrants that all equipment and personnel used in providing the services contemplated herein shall meet all requirements of, and be in compliance with all laws and regulations of the United States Department of Transportation "DOT" and other federal, state or provincial agencies having jurisdiction over any of the services provided pursuant to this Agreement.  CARRIER further warrants that it will immediately provide BROKER with notice, in writing, of any change in its safety rating and provide BROKER copies of any FMCSA Notice of Changes or Notice of Claim related to any change in safety rating.

> 3. There is no minimum volume of freight contemplated by this Agreement.  BROKER is not restricted from tendering freight to other carriers; Carrier is not restricted from performing transportation for third parties. . . .

> 8. Carrier shall be wholly responsible for performing the contemplated transportation and for all costs and expenses of such transportation, including as examples, costs and expenses of all Carrier's transportation equipment, its maintenance, and those persons who operated it.  As to BROKER, CARRIER is an independent contractor, and as such is wholly responsbile in every way for such persons as CARRIER hires, employs, or otherwise utilizes. . . .

> 16. CARRIER shall transport all freight tendered by BROKER only on Equipment operated under CARRIER's authority.  CARRIER shall not in any way sub-contract, broker, or arrange for the freight to be transported by a third party without BROKER's prior written consent.

*Id*. at 2–4.

This agreement defined the relationship between Landstar and CER at the time of the

shipment that resulted in Mr. Courtney's death.  Landstar confirmed that it tendered CER as the

motor carrier for the subject shipment vis-à-vis a "rate confirmation."  ECF 113-9 at 5; *see also*

ECF No. 113-7.  Mr. Scott Ray, Landstar's representative, stated in his deposition that "a rate

confirmation was sent to CER or—or someone representing themselves as CER, and it was

signed and returned back to the Landstar agent.  That's our confirmation that the load was

tendered to CER."  *Id*. at 5.  However, Landstar discovered after the accident that the tractor

4

trailer involved in the collision was not registered to CER—the carrier with which they contracted—and instead belonged to Class Transportation. *Id*. Following the collision Landstar "went after CER because that's who the load was tendered [sic], and then after the investigation played out, it was realized it was a Class truck. So it was very confusing." *Id*. at 3.

While Landstar did not contract with Class Transportation for the subject shipment, Landstar and Class Transportation had done business together on past occasions, prior to mid-2017. On May 11, 2016 Landstar and Class entered into a transportation brokerage agreement. ECF No. 123-2 at 15. A provision in the transportation brokerage agreement required all contract carriers to "meet all requirements of, and be in compliance with all laws and regulations of the United States Department of Transportation." ECF No. 113-5 at 2.

A carrier's safety rating is an important aspect of the trucking industry. The Federal Motor Carrier Safety Administration ("FMCSA") manages trucking safety and assigns contract carriers safety ratings. Class experienced some difficulties with its safety rating. In January 2017, FMCSA sent Class a letter showing "significant non-compliance of hours-of-service violations" and warned that Class's motor carrier authority would be revoked absent future compliance. ECF No. 123-3. In June 2017 FMCSA sent Class another letter "noting significant noncompliance in hours of service, unsafe driving, and vehicle maintenance." ECF No 123 at 3; ECF No. 123-4. Landstar removed Class Transportation from its approved carriers in June 2017. ECF Nos. 123-2 at 20–21;134-1 at 2.

## II. PROCEDURAL BACKGROUND

Plaintiff filed her initial complaint on September 12, 2018. ECF No. 1. The case was assigned to this Court on that same day. Initially the only named defendants were Class and

Arias-Aguilera.  ECF No. 1.  Class did not respond timely to the complaint, and the clerk's office entered a default against it.  ECF No. 7.  However, the Court vacated the entry of default on February 4, 2019.  ECF No. 10.  On November 8, 2019 plaintiff filed a motion to amend her complaint and to join additional parties, which this Court granted.  Plaintiff filed her first amended complaint on November 13, 2019.  In that complaint plaintiff added CER Transport, Inc., Landstar, and Steel King industries as defendants.  ECF No. 30.

On March 19, 2010 YRC Freight Inc. ("intervenor plaintiff") filed a motion to intervene. Following a supplemental motion to intervene, the Court granted the motion on April 29, 2020. ECF Nos. 87, 89.  On March 27, 2020 plaintiff filed a motion to further amend her complaint, which this Court granted.  ECF Nos. 77, 78.  Plaintiff filed her second amended complaint on that same date.  ECF No. 79.  Defendant CER Transport filed its answer on April 2, 2020.  ECF No. 81.  Defendant Steel King Industries filed its answer on April 3, 2020.  ECF No. 82. Defendants Class Transportation and Isidro Arias-Aguilera filed their answer on April 10, 2020. ECF No. 84.  Landstar filed its answer on April 10, 2020 as well.  ECF No. 85.

On October 13, 2020 Landstar filed its motion for summary judgment.  ECF No. 113. Plaintiff filed her response on November 10, 2020.  ECF No. 123.  Landstar filed its response on December 3, 2020.  ECF No. 134.  On October 16, 2020 plaintiff filed a motion for application of Missouri and Florida substantive law.  ECF No. 114.  On October 20, 2020 YRC Freight, the intervenor plaintiff, filed a motion for joinder in plaintiff's motion for Missouri and Florida substantive law.  ECF No. 116.  Defendants CER Transport, Arias-Aguilera, Class Transportation, and Landstar all filed their responses on November 6, 2020.  ECF Nos. 120–122. Plaintiff filed her reply on November 20, 2020.  ECF No. 127.  Defendant Landstar's motion for

6

summary judgment and plaintiff's motion for application of Missouri and Florida substantive law are now both ripe for review.

### III. STANDARD OF REVIEW

A court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The court will examine the factual record and make reasonable inferences in the light most favorable to the party opposing summary judgment. *See Concrete Works of Colo., Inc. v. City and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

### IV. ANALYSIS

Plaintiff's motion argues that the Court should apply Florida law to the issue of liability and Missouri law to the issue of damages. Landstar's motion contends that it is entitled to summary judgment because (1) it had no relationship with Class at the time of the collision, (2) it was not negligent in its hiring of CER, and (3) liability cannot be imputed to the employer of an independent contractor. I begin with plaintiff's motion for application of Florida and Missouri substantive law.

**A.**    <u>**Plaintiff's motion for application of Florida and Missouri substantive law**</u>

The first question is whether the choice of law matters.  "When more than one body of law may apply to a claim, the Court need not choose which body of law to apply unless there is an outcome determinative conflict between the potentially applicable bodies of law."  *SELCO Cmty. Credit Union v. Noodles & Co.*, 267 F.Supp.3d 1288, 1292 (D. Colo. 2017) (internal quotations omitted).   Having looked at the issue, I conclude that plaintiff has sufficiently demonstrated that there are outcome-determinative conflicts between Colorado and Missouri recovery laws and Colorado and Florida liability laws.  ECF No. 114.

For instance, unlike Missouri, Colorado caps non-economic damages and apportions damages awards in wrongful death claims among heirs at law.  C.R.S. § 13-21-102.5(3)(a), 3(c)(1); C.R.S. § 13-21-203(1)(a); C.R.S. § 15-11-102.   Meanwhile, Missouri has no cap on non-economic damages and no such apportionment requirement.   Additionally, under Colorado law an employer generally is not liable for an independent contractor's negligence unless the employer hired the contractor to perform an inherently dangerous activity.  *Huddleston by Huddleston v. Union Rural Elec. Assoc.*, 841 P.2d 282, 292 (Colo. 1992).   By contrast, Florida holds employers liable for an independent contractor's negligence in more contexts.  *Davies v. Com. Metals Co.*, 46 So.3d 71, 73–74 (Fla. Ct. App. 2010).   Thus, a conflict of laws analysis is warranted.

### 1.   <u>The Restatement's Most Signficant Relationship Test</u>

This case is before the Court on diversity jurisdiction.  Federal courts sitting in diversity jurisdiction apply the choice of law rules of their forum states.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 796 (1941).   Colorado follows the Restatement (Second) of Conflict of

Laws (1971) ("the Restatement") for tort actions. *See Kipling v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306, 1310 (10th Cir. 2014). The Restatement states that "[i]n an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in Section 6." Restatement (Second) of Conflict of Laws §146 (1971). Put another way, it is presumed that the law of the state where the injury occurs will apply unless another state has a more significant relationship to the issue before the Court. *Id*.

To determine which state has the most significant relationship to a particular issue, the Restatement advises

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place where the injury occurred;
> (b) the place where the conduct causing the injury occurred;
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and
> (d) the place where the relationship, if any, between the parties is centered.

*Id*. § 145. The principles stated in §6 are:

> (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Regarding contacts, the fact that a "mathematically greater number of contacts relate to one state . . . is not [a] prime determinant as to which state's law should be applied. . . each contact must be evaluated and assigned a relative degree of importance with respect to the particular rule of law at issue." *Sabell v. Pacific Intermountain Express Co.*, 536 P.2d 1160, 1164 (Colo. App. 1975). The Court must not merely count which state has the greater number of contacts. Instead, the Court must assign a relative degree of weight to each contact. *Id*.

The Restatement makes clear that determining both how heavily to weigh a contact and which state's law has the most significant relationship is an issue-specific inquiry. *Id*. Plaintiff argues that Missouri's damages law should apply, and Florida's liability law should apply. I begin with the issue of damages.

2. <u>Whether Colorado or Missouri law should apply to the issue of damages</u>

As mentioned above, the presumption in personal injury cases is to apply the law of the state where the injury occurred, unless some other state has a more significant relationship to the issue. *Id*. § 145. Here, the injury occurred in Colorado, but plaintiff argues that Missouri has the most significant relationship to the issue of damages. Defendants contend that Colorado has the most significant relationship. The parties have only raised the following § 6 principles: the relevant policies of the forum, the relevant policies of other relative interested states and the interests of those states in the determination of the particular issue, the basic policies underlying the particular field of law, and the protection of justified expectations. I limit my analysis to those principles.

Plaintiff urges the Court to find that the place of the injury is secondary here because it was fortuitous that the accident happened in Colorado, and the Court should prioritize the place where the damaged plaintiff is domiciled.  *See* ECF No. 114 at 7–8.  In *Conlin v. Hutcheon*, a District of Colorado case, the court held that Colorado law had the most significant relationship to the issue of damages despite the accident's occurring in Nebraska.  560 F. Supp. 934, 936 (D. Colo. 1983).  There, Colorado law and Nebraska law differed substantially on the issue of damages.  Nebraska followed a theory of contributory negligence, which meant that a plaintiff could not recover any damages if he or she was also negligent.  Colorado did not follow this theory.  The court considered the place-of-injury contact alongside the Restatement's § 6 principles, including the states' underlying policies for their laws.  *Id*.  Ultimately, the court found that Colorado's policy interest of permitting plaintiffs to recover even when they were negligent outweighed Nebraska's policy interest of prohibiting recovery in contributory negligence situations.  *Id*.  In holding that Colorado law applied the court stated "[t]he absence of prevailing policy considerations renders the locale of this accident a 'fortuitous consequence . . . within Nebraska's borders.'"  *Id*. at 936 (quoting *First Nat. Bank in Fort Collins v. Rostek*, 514 P.2d 314, 318 (Colo. 1973)).

In *Sabell*, a Colorado Court of Appeals case, the court applied Colorado law despite the accident's occurring in Iowa.  *Sabell*, 536 P.2d at 1166.  Similar to the facts in *Conlin*, Iowa followed a theory of contributory negligence while Colorado followed a theory of comparative negligence.  The *Sabell* court stated that "[t]he interest of a state in having its negligence rules applied in the resolution of a particular issue will depend upon the policy sought to be achieved by that rule and by the relation of the state to the occurrence and the parties."  *Id*. at 1164.  The

court ultimately found, after weighing the underlying policies for each state's law, that Colorado law should be applied to avoid Iowa's harsh contributory negligence rules. *Id*. at 1166. The *Sabell* court also noted that the parties resided in Colorado, further increasing Colorado's interest in having its own law apply. *Id*.

Plaintiff relies heavily on *Sabell* and *Conlin* to support her contention that the place of the accident should be weighed minimally. However, plaintiff looks only at the holdings—one state's law being applied despite the accident's occurring elsewhere—without fully considering how the states' underlying policies for their laws contributed to the holdings. Comment (e) to § 146 of the Restatement says

> if the relevant local law rule of the state where the injury occurred would impose absolute liability upon the defendant, it is probable that this state is seeking by means of this rule to insure compensation to the injured person. If, on the other hand, the defendant would enjoy a special immunity for his conduct under the local law of the state of injury, it is not clear that the interests of this state would be furthered by application of its rule.

Both the *Sabell* and *Conlin* courts issued rulings consistent with the Restatement's language. Both courts weighed the place of injury minimally only after thoroughly considering the states' intended outcomes and policy considerations. In both *Sabell* and *Conlin*, if the courts had applied the contributory negligence laws of the states in which the injuries occurred, then "the defendant would enjoy a special immunity," and the state's interest underlying the law would not have been furthered by applying the rule. *Id*. Thus, applying the state's law that permitted recovery significantly furthered that state's interests, whereas applying the state's law that precluded recovery did not.

Here, the place of injury should not be minimally weighed because neither Colorado nor Missouri follows the doctrine of contributory negligence, and both states permit recovery. Each

states' recovery rules have the underlying purposes of compensating injured persons and holding negligent actors accountable. *See Carver v. Schafer*, 647 S.W. 2d 570 (Mo. Ct. App. 1983); *Conlin*, 560 F. Supp. at 936. Each states' underlying purposes for its recovery law would therefore be furthered by application of either state's law. Unlike the plaintiffs in *Sabell* and *Conlin*, plaintiff does not risk being fully barred from recovering damages if Colorado law applies. Additionally, because Colorado has "prevailing policy considerations" in having its law applied, the place of injury is not a "fortuitous consequence. . . within [Colorado's] borders." *Conlin*, 560 F. Supp. at 936 (quoting *Rostek*, 14 P.2d at 318). I therefore find that the place of injury weighs in favor of applying Colorado law, the state where the injury occurred.

I next consider where the parties are domiciled. Plaintiff is domiciled in Missouri, and defendants are domiciled in Florida. Plaintiff argues that because she is domiciled in Missouri, Missouri law should apply to the issue of damages. However, plaintiff's domicile is the only Missouri-centered contact. Furthermore, the § 6 principles instruct courts to consider the parties' justified expectations. Plaintiff provides no facts or analysis that points to why the parties' justified expectations would point to applying Missouri law. At a minimum, there is no reason that any defendant would have any reason to expect that Missouri law would govern any aspect of the case. The parties are, of course, arguing for the law that they perceive as the most favorable to them. However, in terms of the elusive concept of the parties' justified expectations, it is this Court's view that the most reasonable expectation, if any, would be the place where the careless driving occurred, the accident occurred and was investigated, and the injury occurred. Indeed, plaintiff expressly alleged that her causes of action arose in Colorado

from "tortious acts" and "tortious injury" that occurred in Colorado.  ECF No. 79 at 2, ¶¶7, 8, 11, 13, 16, 18, 20, 22.

I next must consider where the tortious conduct occurred and where the parties' relationship was centered.  No party alleges that any tortious act occurred in Missouri.  Plaintiff alleges the tortious conduct occurred in Florida when Class hired Arias-Aguilera.  Defendants allege it occurred in Colorado when Arias-Aguilera allegedly failed to secure the tarp. Therefore, with respect to the issue of liability, the location of the tortious conduct weighs against applying Missouri law and in favor of applying Colorado law, where one of the tortious acts occurred.  As to where the parties' relationship was centered, the plaintiff and defendants only came into contact with one another in Colorado when the collision occurred.  The parties had no business relationship centered in Missouri prior to the deadly collision.  In fact, no party had any connection with Missouri other than plaintiff.  The Court therefore finds because no relationship existed in Missouri, this contact too weighs in favor of applying Colorado law. Additionally, because the parties did not have a relationship prior to the collision, this contact is also not heavily weighed.  Restatement § 146, cmt. e.

Plaintiff's primary argument for why Missouri law should apply, despite it having relatively little to do with this case, is that Missouri's underlying policies can only be furthered if its law is applied to the damages issue.  I disagree.  Plaintiff relies heavily on *Carver*, a Missouri Court of Appeals case, that is unbinding on this Court and easily distinguishable.  In *Carver*, plaintiff sought to recover from an Illinois tavern owner who overserved a patron that went on to kill the decedent in a drunk driving accident in Missouri.  *Carver*, 647 S.W.2d at 572.  Plaintiff

filed the case in Missouri and requested that the Court apply Missouri law. The *Carver* court decided that Missouri law should apply and stated

> The relevant policies of the forum state, Missouri, must be considered. The policies behind allowing a full measure of recovery are three fold [sic]. One policy is to provide for the economic well-being of the decedent's dependents so that they will not become wards of the state. A second policy is to provide funds with which to pay creditors of the decedent. A third policy furthered by allowing unrestricted judgments for wrongful death is to promote the admonitory effect such judgments would have on potentially negligent defendants.

*Id.* at 577.

The Court's applying Colorado law would not contravene any of the three policies underlying Missouri's wrongful death law. Colorado permits recovery of both economic and noneconomic damages, so long as the plaintiff is not shown to be 50% or more responsible for the injuries. C.R.S. § 13-21-102.5(2)(b); 13-21-103(1)(a); 13-21-111(a). There is a cap on noneconomic damages which originally was $250,000 but, as applicable to this case, is $436,070 according to defendant's brief. ECF No. 120 at 7. *See* C.R.S. § 13-21-203(1)(a); https://www.sos.state.co.us/pubs/info_center/files/damages_new.pdf. [2] Colorado law thus provides for both the decedent's family's economic well-being and funds with which to pay the decedent's creditors, Missouri's first two policy rationales. Plaintiff implies that Missouri law

---

[2] In her motion plaintiff argues that the cap on noneconomic damages is governed by C.R.S. 13-21-102.5(3)(a). ECF No. 114 at 5. Although that provision states that it applies to all civil actions except medical malpractice claims, Colorado's Wrongful Death Act indicates that it also does not apply to wrongful death claims. C.R.S. § 13-21-203(1)(a) ("Notwithstanding anything in this section or in section 13-21-102.5 to the contrary, there shall be no recovery. . . for noneconomic loss or injury in excess of two hundred fifty thousand dollars, unless the wrongful act, neglect, or default causing death constitutes felonious killing.). The parties have not briefed whether 13-21-102.5(3)(a) or 13-21-203(1)(a) applies, and therefore, the Court does not address the issue here other than to note that it potentially is a disputed issue.

should be applied because a judgment under its law would potentially be greater than one rendered under Colorado law.  Missouri's policy is that plaintiffs recover a full measure of damages, not necessarily the most they can possibly recover.  The third purpose of Missouri's recovery law is to admonish negligent individuals in Missouri.  The *Carver* court dismissed this rationale as unimportant because the negligent act occurred in Illinois, not Missouri.  *Carver*, 647 S.W.2d at 577.  Similarly, this third rationale bears little weight here because the defendants' negligence occurred in Colorado and also allegedly in Florida.

Accordingly, the Court heavily weighs the place of injury and the place where the tortious conduct occurred, both of which support application of Colorado law.  The Court does not significantly weigh where the parties are domiciled or where the relationship between the parties was centered, though the latter also supports application of Colorado law.  Therefore, in considering the Restatement's contacts alongside the § 6 principles, I find that Colorado law should apply to the issue of damages because Colorado, not Missouri, has the most significant relationship to the issue.

### 3.   Whether Colorado or Florida Law Should Apply to the Issue of Liability

Plaintiff argues that Florida is the state with the most significant relationship to the issue of liability.  Plaintiff points to defendants' being domiciled in Florida, and the allegedly negligent act of hiring defendant Arias-Aguilera occurring there.  Defendants again argue that Colorado has the most significant relationship to the issue of liability.  I agree with defendants.

I summarize and incorporate my analysis from Part IV.A.1 here.  The injury occurred in Colorado, not in Florida.  The parties' relationship, albeit minimal, was centered in Colorado— that is where the accident occurred, and the defendants and plaintiff never had any joint contact

or interacted with one another in Florida.  As noted above, plaintiff expressly alleged in her Second Amended Complaint that her cause of action arose in Colorado due to tortious acts and tortious injuries that occurred in Colorado, i.e., careless driving and failing to secure the tarp while driving in Colorado.

The location of the allegedly tortious conduct also supports the Court's applying Colorado law.  Plaintiff claims that the tortious act occurred when the defendants hired Arias-Aguilera, which took place in Florida.  Defendants contend that the tortious act is instead defendant Arias-Aguilera's failing to secure the tarp, which occurred in Colorado.  ECF Nos. 114 at 12, 120 at 4.  However, even if the alleged tortious act occurred in Florida, as plaintiff contends, the Restatement instructs courts to consider the place of injury when the place of injury and the place of conduct are different.  It states,

> On occasion, conduct and personal injury will occur in different states. In such instances, the local law of the state of injury will usually be applied to determine most issues involving the tort.  One reason for the rule is that persons who cause injury in a state should not ordinarily escape liability imposed by the local law of that state on account of the injury.  Moreover, the place of injury is readily ascertainable.  Hence, the rule is easy to apply and leads to certainty of result.

Restatement § 146, cmt. e.  Therefore, the Restatement suggests that the Court should apply Colorado law because it is "readily ascertainable" and will "lead to certainty of result."  *Id*.

I briefly address plaintiff's argument that Florida's underlying policy interests outweigh those of Colorado.  Plaintiff relies on *Wal-Mart Stores, Inc. v. Budget Rent-A Car Systems* to argue that Florida's "distinct interest in holding its residents responsible for their torts" outweighs Colorado's "interest in protecting transients."  ECF No. 114 at 12.  In that case, the issue was whether the law of Florida or Georgia should apply.  *Wal-Mart Stores, Inc. v. Budget Rent-A Car Sys.*, 567 So.2d 918, 920 (Fl. Ct. App. 1990).  Plaintiff incorrectly asserts that the

court held that "Florida law rather than Georgia law applied to the negligence claims even though this accident occurred in Georgia." ECF No. 114 at 12. This is untrue. The Florida appeals court affirmed the trial court's holding that *Georgia* law had the most significant relationship to the negligence claims. *Budget Rent-A-Car Sys.*, 567 So.2d at 920. ("On appeal, this court followed the 'significant relationships' test. . . in affirming the trial court's application of Georgia law to the issues raised in that litigation."). However, it held that Florida law had the most significant relationship to defendant's separate contribution claim. *Id*. Thus, plaintiff's argument is unavailing, and *Budget Rent-A-Car* stands for nothing more than the Restatement's general proposition that the law of the state in which the injury occurred generally applies.

The contacts outlined in the Restatement therefore weigh in favor of applying Colorado law because Colorado, not Florida, has the most significant relationship to the issue of liability. In addition, Colorado, not Missouri, has the most significant relationship to the issue of damages. Plaintiff's motion to apply Florida and Missouri substantive law is thus DENIED.

**B.**  **Landstar defendants' motion for summary judgment**

Plaintiff has pled two claims against Landstar: (1) negligence, and (2) respondeat superior.[3] *See* ECF No 79 at 28, 31. Plaintiff's first claim against Landstar stems from Landstar's alleged negligent hiring of defendants Class, CER, and Arias-Aguilera, a Class

---

[3] The second amended complaint, ECF No. 79, clearly lists these two causes of action against Landstar. In her response to Landstar's motion for summary judgment plaintiff mentions additional claims, including agency between the defendants, negligent selection or hiring, negligent retention, and vicarious liability. ECF No. 123 at 2. However, plaintiff did not plead negligent selection, negligent hiring, or negligent retention with particularity against defendant Landstar in her second amended complaint. Accordingly, the Court addresses only the well-pled claims of negligence and respondeat superior. The Court also briefly addresses an agency theory of liability.

employee.  Plaintiff's respondeat superior claim seeks to hold Landstar vicariously liable for

CER's, Class's, and Arias-Aguilera's alleged negligence.

Landstar moves for summary judgment as to both claims.  As to the first claim, Landstar

argues that it cannot be negligent as a matter of law because (1) it never hired Class or Arias-

Aguilera to deliver the subject shipment, and (2) it was not negligent when hiring CER.  ECF

No. 113 at 5.  As to the second claim, Landstar argues that liability cannot be imputed to

Landstar for the negligence of an independent contractor.  ECF No. 134 at 9.  Plaintiff argues

that defendants Class and CER are the same entity and that Landstar knew or should have known

this.  ECF No. 123 at 10.  They further argue that Class's and Arias-Aguilera's liability should be

imputed to Landstar because Landstar hired them to perform an inherently dangerous activity.[4]

*Id*. at 11.

1.  Negligence Claim

Plaintiff contends that Landstar acted negligently when it hired Class, CER, and Arias-

Aguilera to deliver the subject load.  Defendant argues it cannot be found negligent because it

never hired Class or Arias-Aguilera to deliver the load, and that CER had no safety violations

that would have put Landstar on notice that it was an incompetent carrier.  Plaintiff claims that

CER and Class are the same entity, and that Landstar should have known this fact.  Therefore,

before reaching the elements of negligence, I must first consider whether Class and CER were

the same entities as of the date of the collision.

---

[4] Plaintiff also makes several arguments under Florida law. However, in Part IV.A.4 the Court held that
Colorado law applies to the issue of liability.

a.  <u>Whether CER and Class are the same entity</u>

Although Landstar hired CER to complete the subject shipment, a tractor trailer registered to Class, not CER, was involved in the December 8, 2017 collision.  Plaintiff, without citing to any supporting case law, argues that Class and CER "were essentially the same entities and that Class Transportation's significant federal noncompliance issues would require additional investigation in both entities before contracting additional loads."  *Id*. at 14.  The Court is not persuaded.

Defendants CER and Class were registered as two separate entities with Florida's secretary of state.  They were each registered as for-profit corporations on different dates, and each listed different registered agents.  *See* ECF Nos. 113-1, 113-2.  Furthermore, they each had distinct DOT motor carrier registration numbers.  ECF Nos. 113-3,113-4.  Plaintiff claims that Landstar should have known that CER and Class were operating as "chameleon carriers," i.e. "carriers which have been put out of service and then assume new identities."  ECF No. 123 at 10.  However, as Landstar points out, both carriers were registered with the Florida Secretary of State in March 2015.  ECF No. 134 at 5.  There is thus no evidence that one was trying to replace the other.

Plaintiff next claims that both Class and CER employed Arias-Aguilera.  Even if this were true, Arias-Aguilera was working for *Class* at the time of the subject shipment, so whether he also worked for CER is irrelevant to Landstar's liability in this case.  Plaintiff has already acknowledged that Arias-Aguilera's being an employee of Class at the time of the accident is undisputed.  ECF No. 56 at 5.  Plaintiff again argues that Landstar should have known that CER and Class were the same entity because the same person signed under the authority of two

separate motor carriers.  Plaintiff points to no law that precludes a person from operating two separate carrier companies, and the Court is not aware of any such law.  Furthermore, plaintiff's own expert admitted that Class and CER were separate entities.  ECF No. 113-10 at 7.

Based on these facts, I find that no reasonable jury could find that Class and CER were the same entity, or that Landstar had a relationship with either Class or Arias-Aguilera with respect to the subject shipment.  Accordingly, no reasonable jury could find Landstar negligent for its alleged negligent hiring of Class or Arias-Aguilera because no such hiring took place.

### b. Whether Landstar was Negligent when it Hired CER Transport

I next consider whether Landstar was negligent due to its "failure to investigate" and "screen" CER when hiring it to deliver the subject load.  According to plaintiff, this negligence resulted in the "subject crash itself."  ECF No. 123 at 16.  I disagree.  To prevail on a claim of negligence in either the hiring or supervision context, the plaintiff must show "the usual elements of negligence—duty, breach, injury, causation—and the establishment of an agency relationship between the employer and the alleged employee."  *Nielsen v. Archdiocese of Denver*, 413 F. Supp. 2d 1181 (D. Colo. 2006) (citing *Moses v. Diocese of Colorado*, 863 P.2d 310, 323–24 (Colo. 1993), *cert. denied*, 511 U.S. 1137 (1994)).

Here, plaintiff does not show "the usual elements of negligence" with respect to Landstar's hiring of CER Transport because plaintiff cannot demonstrate a genuine dispute of material fact as to whether Landstar breached its duty of care.  First, the majority of plaintiff's arguments rely on the assumption that Class and CER were the same entity, an argument I found unreasonable in the preceding section.  Second, plaintiff does not provide factual support from the record for the actions she alleges constitute Landstar's breach.

21

For instance, plaintiff argues that defendant breached its duty of care by hiring CER because it ignored the fact that Class Transportation had "significant federal noncompliance issues." ECF No. 123 at 14. Plaintiff uses ample space in her response to list Class's noncompliance issues. *Id*. 2–3. However, plaintiff has presented no evidence that CER, the entity Landstar actually hired for the subject load, had any FMCSA noncompliance issues, or that it had received FMCSA noncompliance letters similar to those that Class received.

Furthermore, the brokerage agreement between Landstar and CER prohibited CER from re-brokering the subject shipment absent Landstar's approval and authorization. ECF No. 113-6 at 4. Plaintiff has presented no evidence that Landstar knew about CER's re-brokering to Class, or that Landstar authorized it. Landstar's motor carrier contract with CER also required all motor carriers to contact it immediately if any change occurred in the carrier's FMCSA safety rating. *Id*. at 2. Whether Landstar learned of the FMCSA's safety-related concerns about Class from Class or from another source is unclear. What is clear, however, is that Landstar stopped doing business with Class in June 2017, the same time when the FMCSA's safety issues appeared to have peaked and six months before the subject accident.

Plaintiff next argues that Landstar was negligent when it violated its own internal policy that required Landstar to use DAT carrier monitoring systems to track motor carrier safety ratings. ECF No. 123 at 16. However, plaintiff does not provide any document or proof that such a policy existed. Instead, plaintiff only cites to plaintiff's expert report, a report that also does not specify (1) where this purported policy can be found in discovery, or (2) the alleged policy's language. At this stage in the proceedings, it is insufficient for plaintiff to merely rest on the allegations in her pleadings. Instead, the plaintiff must provide factual support in the

record.  *Celotex Corp.*, 477 U.S. at 324.

Additionally, the summary judgment record demonstrates that Landstar *did* follow the

policies that the expert includes in the expert's report.  While plaintiff does not provide this

Court with any of the alleged internal documents listing Landstar's requirement that DAT carrier

monitoring be used, plaintiff's expert does quote some of Landstar's internal guidelines for

hiring carriers.  Those read

> These guidelines require Landstar's Carrier Qualifications Department to perform the following safety checks:
> - Carrier Qualificaitions [sic] [Dept] uses FMCSA websites available for public access for regulatory reviews
> - Motor carriers registered with a USDOT number and rated as "none" are "non-rated" and subject to the CSA-e BASIC [score] as produced monthly by SaferWatch

ECF No. 123-8 at 7.

Plaintiff claims that Landstar breached its duty because it failed to follow these protocols

when hiring CER and Class.  However, plaintiff does not offer any evidence suggesting that

Landstar did not follow these policies and ignores the testimony of defendant-representative

Scott Ray.  Mr. Ray's deposition testimony shows Landstar relied on both the FMCSA and

SaferWatch when hiring motor carriers.  Mr. Ray stated that "if the carrier loses authority, we're

not going to do business with them.  If their carrier's scores go over thresholds that we've

established, we're not going to do business with them until they improve those. . . .[T]hat's what

we look at when deciding."  ECF No. 123-2 at 4.  To ensure a motor carrier has the requisite

authority, Landstar would look into the motor carrier's safety rating.  *Id*. at 10.  Landstar also

relied on safety measurement systems ("SMS") scores for motor carriers.  *Id*. at 11.  "SaferWatch

goes out to that SMS system and gathers that inspection activity and any data they can that's

available publicly on that carrier and then brings those back in and calculates what we call an e

score." *Id*. at 11; ECF No. 134-1 at 1.  Thus, the evidence shows that Landstar did follow its

policies of relying on both FMCSA and SaferWatch scores when hiring its motor carriers.

The Court therefore finds that plaintiff's negligence claim against defendant Landstar

must fail because plaintiff has presented no support from the record that demonstrates a genuine

dispute of material fact as to (1) whether Class and CER were the same entity, and (2) whether

Landstar breached its duty of care when hiring CER Transport to deliver the subject load.

2.  Respondeat Superior Claim

The issue of whether an employer can be held liable for the negligence of a third party

turns on whether the third party is an employee, an agent independent contractor, or a non-agent

independent contractor.  The Court must therefore determine the nature of the relationship

between Landstar and CER.  Generally speaking, an employer is not liable for an independent

contractor's negligence.  *Huddleston*, 841 P.2d at 287.  A truly "independent" contractor, as the

name suggests, operates free of the control and supervision of an employer.  However, merely

labeling someone an "independent contractor" does not make him one.  *Faith Realty &*

*Development Co. v. Industrial Comm'n*, 460 P.2d 228, 229 (Colo. 1969).

Courts use the right-to-control test to determine whether someone is an independent

contractor or an employee.  *Continental Bus System*s, *Inc. v. N.L.R.B.*, 325 F.2d 267, 271 (10th

Cir. 1963); *see also Dumont v. Teets*, 262 P.2d 734, 735 (Colo. 1953).  An employee is someone

in an employment relationship "where the employer has the right to direct and control the

method and manner in which the work shall be done and the result accomplished . . . ."

*Continental Bus Systems, Inc.*, 325 F.2d at 271.  By contrast, "an independent contractor is one

24

who engages to perform services for another, according to his own methods and manner, free from the direction and control of the employer in all matters relating to the performance of the work, and accountable to him only for the result to be accomplished." *Id*. "The line of separation between the two is the degree of direction and control." *Id*. While determining the extent of control is paramount, courts can also consider other factors including "permanency of the relation, the investment in facilities for the performance of the work, and opportunity for profit or for loss." *Id*.

A distinction also exists between agent independent contractors and non-agent independent contractors. An agent independent contractor "represents his principal contractually" and "[i]f properly authorized he makes contracts or other negotiations of a business nature on behalf of his principal and by which his principal is bound." *Grease Monkey Int'l v. Montoya*, 904 P.2d 468, 472 (Colo. 1995) (internal quotations omitted). A principal may be liable for the agent's torts if the agent is acting with apparent authority. *Id*. Conversely, a principal is typically not liable for the actions of a non-agent independent contractor. A non-agent independent contractor is one who "is not a fiduciary, has no power to make the one employing him a party to a transaction, and is subject to no control over his conduct." *Digital Landscape Inc. v. Media Kings LLC*, 440 P.3d 1200, 1212 (Colo. Ct. App. 2018) (internal quotations omitted).

Landstar argues that CER Transport, the entity with which it brokered, was an independent contractor rather than an employee. Plaintiff does not explicitly dispute this. The brokerage agreement between the parties explicitly states "[a]s to BROKER, CARRIER is an independent contractor, and as such is wholly responsible in every way for such persons as

CARRIER hires, employs or otherwise utilizes." ECF No. 113-6 at 2. While the contract labeling CER as an independent contract is not dispositive, other factors support this conclusion. For instance, Landstar engaged CER Transport to perform services on its behalf, and the relationship was non-exclusive. *Id.* Further, the contract between Landstar and CER required CER to "be wholly responsible for performing the contemplated transportation and for all costs and expenses of such transportation" and "to furnish all equipment necessary or required for the performance of its obligations" at its own cost. *Id.* As the broker, Landstar did not have "the right to direct or control the method and manner" in which CER completed the work, and CER was free from Landstar's direction and control. *Continental Bus Systems, Inc.*, 325 F.2d at 271. I therefore find that Landstar hired CER Transport as an independent contractor, not as an employee.

Additionally, no facts have been alleged suggesting that CER had Landstar's authority to enter it into binding contracts, or that CER was a fiduciary of Landstar. The language in the brokerage agreement between CER and Landstar proves that no such authority existed. That section reads, "CARRIER shall transport all freight tendered by Broker only on Equipment operated under CARRIER's authority. CARRIER shall not in any way sub-contract, broker, or arrange for the freight to be transported by a third party without BROKER's prior written consent." ECF No. 113-6 at 4. CER therefore had no "authority to make Landstar a party to a transaction." *Digital Landscape Inc.*, 440 P.3d at 1212. Accordingly, the Court finds that CER was a non-agent independent contractor.

<u>a. Whether the inherently dangerous activity exception applies</u>

Colorado's tort law generally precludes employers from being liable for a non-agent

independent contractor's negligence.  However, a widely recognized exception to this rule imputes liability to the employer if the employer hired the independent contractor to perform an inherently dangerous activity.  *Huddleston*, 841 P.2d at 287.

Plaintiff asserts that Class's and CER's negligence should be imputed to Landstar because motor carriers are engaged in an inherently dangerous activity.  ECF No. 123 at 11.  But plaintiff cites no supporting legal authority for her conclusion.  Plaintiff writes that "Landstar is vicariously liable because interstate trucking involving 80,000 lb. tractor-trailers is inherently dangerous.  Scott Ray, acting as corporate representative for the Landstar Defendants agreed that operating an interstate tractor-trailer can be a dangerous job with the potential to harm and kill other people."  *Id*. at 11.  However, "inherently dangerous activity" is a term of art in tort law.  An activity is not inherently dangerous simply because a defendant-representative admits that the activity involves some amount of danger or risk.

In *Huddleston*, the Colorado Supreme Court provided guidelines for the inherently dangerous activity exception.  There, the court considered whether chartering a small passenger plane to fly over the mountains in the winter was an inherently dangerous activity.  While the court found that such an activity was not *per se* inherently dangerous, it ultimately found this was a question of fact that should have been presented to the jury given the specific facts underlying the case.  *Huddleston*, 841 P.2d at 294.

While *Huddleston*'s facts are easily distinguishable from this case, that court's analysis clarifies the inherently dangerous activity exception.  The Court stated that to be inherently dangerous an activity must "present a special or peculiar danger to others. . . that is different in kind from the ordinary risks that commonly confront persons in the community."  *Id*. at 290.

27

The court further articulated the two primary policy rationales for the exception as follows:

> The first is that employers whose enterprises directly benefit from the performance of activities that create special and uncommon dangers to others should bear some of the responsibility for injuries to others that occur as a result of the performances of such activities . . . . The second is that it is sound public policy with regard to an inherently dangerous activity to have another layer of concern in order to try to ensure that activity that is inherently dangerous gets enough attention so that we reduce the number of people who are injured.

841 P.2d at 287.  The *Huddleston* court also relied heavily on the Restatement (Second) of Torts, which states that an employer who hires an independent contractor to perform a task that involves "a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work. . . is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions . . . ."  Restatement (Second) of Torts, § 427 (1997).

*Beavers v. Victorian*, a Western District of Oklahoma case, discusses the inherently dangerous activity exception to independent contractor liability.  *Beavers* also involved a motor carrier collision in Colorado.  *Beavers v. Victorian*, 38 F. Supp. 3d 1260, 1268 (W.D. Okl. 2014). That court, applying Colorado law, considered whether the motor carrier was engaged in an inherently dangerous activity.  The court stated "[i]n this case, there are no facts in the summary judgment record to suggest that the transportation services was 'inherently dangerous.'"  *Id*. at 1268–1269.  I agree.

I also agree with defendant-representative Scott Ray that engaging in motor carrier services presents some level of risk.  However, I, like the court in *Beavers*, do not find that this activity rises to the level of inherently dangerous.  First, the policy considerations underlying the inherently dangerous activity exception do not apply to this type of activity.  Transporting

materials on roads in trucks does not create "special or uncommon dangers" nor is there a way to ensure that driving a tractor trailer "gets enough attention so that we can reduce the number of people who are injured." *Huddleston*, 841 P.2d at 287.  Instead, while tractor trailers indubitably may be involved in collisions and accidents, as this case makes clear, such accidents are not "different in kind from the ordinary risks that commonly confront persons in the community." *Id*. at 290.  I therefore find that Landstar did not hire CER or Class to perform an inherently dangerous activity and therefore their liability cannot be imputed to Landstar.  Thus, Landstar's motion for summary judgment is GRANTED as to plaintiff's respondeat superior and agency claims.

## ORDER

1. Intervenor plaintiff's motion to join plaintiff's motion for application of Missouri and Florida substantive law, ECF No.116, is GRANTED.

2. Plaintiff's motion for application of Missouri and Florida law, ECF No. 114, is DENIED

3. Landstar's motion for summary judgment, ECF No. 113, is GRANTED.

DATED this 13th day of January, 2021.

BY THE COURT:

R. Brooke Jackson
United States District Judge